Anna Richo **MOORE**, Plaintiff,

v.

**NUTRASWEET COMPANY, Defendant.**

**No. 92 C 1046.**

United States District Court,
N.D. Illinois, E.D.

Sept. 23, 1993.

As Corrected Nov. 15, 1993.

**1389**

alleging racial discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") and both race-based and sex-based discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII"),[2] as well as asserting a detrimental reliance claim under Illinois law (over which this Court has supplemental jurisdiction under 28 U.S.C. § 1367). NutraSweet now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, NutraSweet's motion is granted in its entirety and this action is dismissed with prejudice.

*Submissions of the Parties*

This District Court's General Rule ("GR") 12(M) requires every Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact alleged. GR 12(N) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed dispute as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Here the parties have tendered those submissions (and more[3]) and have briefed the issues thoroughly.

Relevant aspects of the parties' submissions will be referred to in this way:

Vicki Lafer Abrahamson, Darlene A. Vorachek, Chicago, IL, for plaintiff.

Richard C. Robin, Edward C. Jepson, Jr., C. Elizabeth Belmont, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Anna Richo Moore ("Richo")[1] has sued The NutraSweet Company ("NutraSweet"),

1. Although plaintiff is now Anna Richo Moore, much of the evidence as well as the parties' submissions in this case continue to refer to her as Richo. This opinion does the same.

2. Richo's Amended Complaint sets forth four federal counts: claims of race discrimination for failure to make her MIP-eligible, in violation of Title VII (Count I) and Section 1981 (Count II), and claims of sex and race discrimination in her termination, in violation of Title VII (Count III) and Section 1981 (Count IV). Those counts were brought under, and of course were affected by, the 1991 Civil Rights Act. When NutraSweet filed a motion to strike or dismiss Richo's claims in part on the ground that the 1991 statute is not retroactive, this Court initially denied that motion. Since then this Court (like most of its colleagues) has viewed our Court of Appeals' decisions in *Luddington v. Indiana Bell Tel. Co.,* 966 F.2d 225, 227–30 (7th Cir.1992) and *Mozee v. American Commercial Marine Serv. Co.,* 963 F.2d 929 (7th Cir.1992) as having sent strong

signals negating the retroactive application of that statute to cover conduct antedating its effective date. Now our Court of Appeals has accepted *Mojica v. Gannet Co.,* 986 F.2d 1158 (7th Cir.1993) (per curiam) for en banc review and the Supreme Court has granted certiorari in *Landgraf v. USI Film Prod.,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993) and *Rivers v. Roadway Express, Inc.,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993), so that no definitive answer to the problem is yet available. This opinion need not reach the tangled retroactivity issues, because summary judgment is proper even assuming prospective application.

3. In response to NutraSweet's GR 12(M) statement, Richo's counsel proffered a document covering some 40 pages, accompanied by a 21-page "statement of additional material facts requiring the denial of defendant's motion for summary judgment." Not to be outdone, NutraSweet responded by filing even bigger briefs and additional appendices.

1.  NutraSweet's Memorandum in Support of Its Motion for Summary Judgment: "D.Mem.—";

2.  Richo's "Answer" to D.Mem.: "P.Mem.—";

3.  NutraSweet's Reply: "D.R. Mem.—";

4.  GR 12 submissions: "D. 12(m) ¶—," "P. 12(n)(1) ¶—," "P. 12(n)(2) ¶—" and "D. 12(n)(2) ¶—"[4]; and

5.  Exhibits accompanying the parties' submissions: "P.Ex.—" and "D.Ex.—."

Though the parties' eagerness to do battle over every sentence has made it extraordinarily difficult for this opinion to set forth the background to this dispute in any straightforward fashion, this Court has gone through their submissions in painstaking detail in an attempt to do so. Except as made clear by the text of the opinion, the use of a GR 12 citation without any other reference to the record indicates that the opposing party has not disputed the assertion (or sometimes that a purported dispute is a nit-pick that reflects a claimed distinction without any real difference—see n. 5).

### Summary Judgment Standard

In an effort to demonstrate the existence of material fact issues that would preclude summary judgment, Richo's experienced counsel has waded through and produced volumes of paper (deposition excerpts and documents as well as lengthy memoranda), fighting tooth and nail over every asserted fact.[5] To be sure, NutraSweet bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)), but that requirement does not destroy Rule 56's "utility as a vehicle for the final disposition of lawsuits without the need for an evidentiary hearing" (*Wilcox v. Niagara of Wisconsin Paper Corp.*, 965 F.2d 355, 356 (7th Cir. 1992)). Neither sheer bulk (see *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) nor the existence of a disputed fact of one kind or another necessarily suffices to defeat a summary judgment motion, for a "genuine" issue does not exist unless record evidence would permit a reasonable factfinder to adopt the nonmovant's view (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), and only facts that would prove outcome-determinative under the substantive law are "material" (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)).

For those purposes this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant Richo (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991)). To be sure, while "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate

---

4.  P. 12(n)(1) contains Richo's paragraph-by-paragraph response to NutraSweet's GR 12(M) statement, while P. 12(n)(2) is Richo's additional statement of facts referred to in n. 3. Nutra-Sweet's paragraph-by-paragraph response to the latter is what is being cited here (for lack of any more descriptive label) as D. 12(n)(2).

5.  All too frequently the purported factual disputes either are not borne out by the record or are purported distinctions without any real difference sufficient to merit consideration. Quite apart from the needless extra work that has been thrust on NutraSweet to respond in kind (see n. 3), that approach is ill-advised for at least two reasons:

   1. It subverts the main goal of GR 12, which is to facilitate a court's ability to smoke out quickly whether there are really disputed factual issues and, if so, whether they are really material (that is, outcome-determinative)—see this week's extended discussion of that very subject by our Court of Appeals, affirming a summary judgment by this Court in *Stewart v. McGinnis*, 5 F.2d 1031, 1033–35 (7th Cir. 1993). What Richo has done is to compound the work of this Court unfairly, rather than simplifying it as GR 12 intends.

   2. In the classic tradition of the fable of the boy who cried "Wolf!", Richo has also done herself a disservice. By pointing to a multitude of nondifferences or meaningless differences, she has made it all the more difficult for the reader to spot any real differences that might arguably exist—a poor litigation strategy, perhaps pursued in the hope that the court will throw up its hands, deny a meritorious Rule 56 motion and set the case for trial.

the potential for summary judgment in such cases (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)). Moreover, "a plaintiff facing the prospect of summary adjudication cannot 'sit back and simply poke holes in the moving party's summary judgment motion'" (*Young In Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993)).

### Facts

This section will provide the background of Richo's conflict with NutraSweet in what should be sufficient detail to illuminate the issues. Some additional particulars are set forth as necessary in the later text of this opinion.

#### NutraSweet's Legal Department

NutraSweet manufactures, sells and distributes among other items a sweetener ("aspartame") and a fat substitute ("Simplesse") that are used in food and beverages (D. 12(m) ¶ 1). It has its own legal department, which at all times relevant to this litigation was run by Vice President–General Counsel Linda Gohlke ("Gohlke," a white female) and Deputy General Counsel Steven Goldberg ("Goldberg," a white male). Their department included attorneys in three positions: Directors, Senior Attorneys and Attorneys (P. 12(n)(2) ¶ 9).

Richo (a black female) is a May 1986 graduate of DePaul University Law School.[6] After receiving her diploma she worked at Peterson, Ross, Schloerb & Seidel and was admitted to practice in 1987 (D 12(m) ¶¶ 15–16).[7]

During the summer of 1988 Richo decided to seek work in a corporate in-house legal department and utilized a search firm to facilitate her career move (*id.* ¶ 17). Toward the end of 1988 a member of that search firm told Richo of an opening in NutraSweet's legal department (*id.* ¶ 18). Richo, who was

interested in the position, then met with Goldberg and another attorney for an initial interview (*id.* ¶ 19). Having passed that hurdle, Richo was called back for a second round of interviews in early 1989. Before that second session Richo notified NutraSweet that she was pregnant, and in the course of the interviews she said she was expecting the baby during August 1989 (*id.* ¶ 20).

During that second set of interviews Richo met with Gohlke (*id.* ¶ 22), who said that she was looking to hire a black person into the legal department (*id.*; D. Ex. 1: Richo Dep. 151–52).[8] Ultimately Richo received an offer to start at $70,000, an increase over what she was then making. At no point during the interview process did bonus eligibility arise, nor did any recruiter or anyone from NutraSweet mention that Richo was eligible for or would receive a bonus (*id.* 168, 309). Richo accepted NutraSweet's offer and joined NutraSweet's legal department on April 24, 1989 (D. 12(m) ¶ 2).

At that time NutraSweet's legal department was divided into three groups: Litigation and Regulatory Law ("Litigation"), Commercial Law ("Commercial") and Patent and Intellectual Property ("Patent") (*id.* ¶ 3). Because each party focuses on the structure and personnel of those departments, this opinion turns to each department briefly.

Before Richo joined Litigation, it comprised just two lawyers, Senior Attorney Jack Silhavy ("Silhavy") and Attorney Gwenda Burkhardt ("Burkhardt") (*id.* ¶ 4). Silhavy (a white male) graduated from Loyola University School of Law in 1981 and joined NutraSweet on October 20, 1986 after having worked for three firms, most recently spending a three-year stint at Wildman, Harrold, Allen & Dixon (*id.* ¶ 5). Burkhardt (a white female) graduated from John Marshall School of Law in January 1982. Before coming to NutraSweet on November 12, 1986, she had been employed for 4½ years as an

---

6. To avoid repetition, after this opinion has once referred to any law school by its full name, it will simply speak of the institution by the name of the university—in this instance "DePaul."

7. Richo failed the Illinois bar examination on her first attempt but passed it in the February 1987 sitting (D. 12(m) ¶ 15).

8. In fact, NutraSweet had agreed to pay an additional fee to recruiters if it hired a minority candidate (D. 12(m) ¶ 23).

attorney at Vedder, Price, Kaufman & Kammholz (*id.* ¶ 6). On April 1, 1990 Silhavy received a promotion and became Director of the Litigation department (*id.* ¶ 7).[9] Richo and Burkhardt became responsible to him, and he reported to Goldberg (*id.*).

At the time of Richo's hire, Patent comprised three white male attorneys (*id.* ¶ 9). Its Director was John Sanders ("Sanders"), a 1980 graduate of John Marshall with prior experience in three major companies' patent departments (*id.*; D.Ex. O).[10] Sanders supervised Jeff Hoster ("Hoster"), who graduated from University of Illinois College of Law in 1983 and had spent four years at Exxon (D.Ex. 26), and Craig Bell ("Bell"), a 1980 University of Pennsylvania School of Law graduate who had previously worked as an associate in a law firm and as an assistant district attorney (D.Ex. 18). Bell left NutraSweet shortly after Richo joined, and Attorney Andrew Solomon ("Solomon," a white male), who had graduated from University of Missouri School of Law in 1985 and had then worked as a law firm associate, joined soon thereafter (D. 12(m) ¶ 10; D.Ex. 30).

Commercial comprised four attorneys when Richo began to work in the legal department. Its Director was Cathy Anderson ("Anderson," a white female), a 1976 graduate of Loyola who had joined NutraSweet in 1986 (D. 12(m) ¶ 11; P.Ex. U; D.Ex. 17). Christine Karbowiak ("Karbowiak," a white female)[11] was a Senior Attorney who had joined NutraSweet's legal department in 1986. She had graduated from University of Illinois in 1978 and, before joining NutraSweet, had worked as a law firm associate and at Searle, which until 1986 had been NutraSweet's "sister company" (P. 12(n)(2) ¶¶ 12–13). Also in Commercial were Senior Attorney Carmela Zammuto ("Zammuto," a white female), who had graduated from DePaul in 1980, and Attorney Greg Berenstein ("Berenstein," a white male), a 1985 graduate of the University of Iowa College of Law who

had joined NutraSweet in 1986 (something over a year after graduation) after having worked as a law firm associate (P.Ex. U; D.Ex. 20; D.Ex. O). At that point each of the other three attorneys reported to Anderson, who was in turn supervised by Goldberg (D. 12(m) ¶ 11). Additionally, Gohlke herself practiced in Commercial and performed some supervisory functions, though the parties dispute the extent of her supervisory role (D. 12(m) ¶ 11 and P. 12(n)(1) ¶ 11).

Commercial experienced some changes during 1989 and 1990. In 1989 two new hires came aboard. In May 1989 Deirdre Cody ("Cody," a white female),[12] who graduated from law school at the University of Georgia in 1984 and who had since worked at Mayer, Brown & Platt, at Shefsky, Saitlin & Froelich Ltd. (now Shefsky & Froelich Ltd.) and at Chicago Pacific Corporation, signed on (P.Ex. E: Cody Dep. 14–15). And on September 25, 1989 NutraSweet hired Warren Grayson ("Grayson") as a Senior Attorney. Grayson (a white male) had graduated from John Marshall in 1980 and had been Division General Counsel–Assistant Secretary at Carson Pirie Scott & Company (D. 12(m) ¶ 14; D.Ex. O).

In February 1990 Anderson requested and received part-time status so that she could spend more time with her children (D.Ex. B: Anderson Dep. 18–19). In November 1990 Anderson was asked to return to work full-time, failing which she would have to give up her position as Director. Gohlke felt that the position required more attention than a part-time employee could provide, at least in part because the company was changing and she envisioned more legal work that would be performed by fewer individuals (D.Ex. F: Gohlke Dep. 42–44). Anderson chose not to return full-time at that point and became a

---

9. At that time each of Commercial and Patent already had an attorney in a Director level position (*id.* ¶ 8).

10. Sanders was supervised by Goldberg (D. 12(m) ¶ 9).

11. Though Karbowiak is now Christine Karbowiak Vanek, each side refers to her as Karbowiak. This opinion will do the same.

12. Cody is now Deirdre Cody Brekke, but each party refers to her as Cody. Again this opinion will do the same.

Senior Attorney. Grayson was promoted to the Director position.[13]

*Compensation Other Than Salary*

NutraSweet has at least two forms of compensation above salary: the management incentive program ("MIP") and the special awards program ("SA" or "special awards").[14] MIPs tended to be larger than special awards, and Goldberg understood that there was a cap on special awards, which he recalled as being $5,000 (D.Ex. 14: Goldberg Dep. 51).

As already stated, before Richo was hired no one from any recruiter or from NutraSweet mentioned to her that she would receive or be eligible for a bonus at NutraSweet (D.Ex. 1: Richo Dep. 168, 309). Then many months later (at some point in 1990) Richo heard attorneys talking about both special awards and bonuses. In March 1990 Richo was notified that she had been selected to receive a $2,500 special award (D.Ex. 4). That did not trouble her (D.Ex. 1: Richo Dep. 320):

> When I got this I was like okay, I have got my bonus,[15] and I remember thinking it is probably less because I had the maternity leave and I was only here for half of '89. . . .

Richo still heard attorneys using the terms bonus and special award, and wanting to clarify that she was bonus-eligible she turned to Goldberg (*id.* 318–19). He told her she was (*id.* 321).[16] She did not ask him how bonuses were calculated, and even her own testimony reflects that she did not ask specifically about the two plans, instead using only

the phrase "bonus eligible" (*id.;* P. 12(n)(1) ¶ 49 tries to hedge somewhat on that score, but the record is uncontradicted).

That issue came up again at the very end of November 1990, when Richo sent a memo to Goldberg and Silhavy asking about the structure of the legal department, its different grade levels and the differences between bonuses and special awards (D.Ex. 5). She specifically asked whether bonuses and special awards were the same, how people qualified for either and what each had as its maximum and minimum limits (*id.*). Not hearing quickly from either of them, Richo went to Goldberg some time in December. Goldberg told her that special awards and bonuses were "essentially the same" but had historically (though not presently) come out of "different pots of money" (D.Ex. 1: Richo Dep. 330–31).

*NutraSweet's 1991 Reconfiguration*

NutraSweet's patent on aspartame was set to expire on December 14, 1992. On June 1, 1990 Robert Flynn ("Flynn"), who in previous years had been a member of NutraSweet's Board of Directors, became its Chief Executive Officer (D.Ex. 12: Flynn Dep. 5; D. 12(m) ¶ 55). He testified that NutraSweet anticipated a 50% decrease in earnings and feared increased competition due to the patent's expiration (D.Ex. 12: Flynn Dep. 92–93). In response Flynn created a new vision for the company and charged the management team with introspective examinations of their organizations that would create cost reductions from $40 to $60 million (*id.* 93–94). Flynn also instructed those who reported

---

**13.** Anderson later returned to full-time work and now holds the position of Deputy General Counsel (P.Ex. U).

**14.** As revealed by the deposition testimony, many attorneys referred to MIPs as bonuses (see, e.g., D.Ex. 13: Gohlke Dep. 171, 181–82). But it should be kept in mind that to those unfamiliar with the two categories of NutraSweet (as Richo indisputably was when she was hired and for well over a year afterward), what NutraSweet labeled as "special awards"—discretionary amounts over and above regular compensation—are normally thought of and referred to as "bonuses" as well. This is highly relevant to Richo's state-law claim as well as to one of her federal claims, as the later discussion will reflect.

**15.** [Footnote by this Court] Note how that usage by Richo herself confirms the point just made in the preceding footnote.

**16.** Richo characterizes that answer as a "promise" and uses it to ground her state law reliance claim. She says that in reliance on Goldberg's statement she ordered a new Mercedes, and that if she had known then that she was not MIP-eligible she would have sought other employment. As discussed later, even apart from the question whether Goldberg's statement qualifies as a "promise" in the sense demanded by Illinois law, the reliance claim makes no sense in terms of what Richo knew (or more accurately did not know) at that time.

directly to him to restructure their organizations and to recommend staff reductions (*id.* 94–95; D.Ex. 13: Gohlke Dep. 116; D. 12(m) ¶ 61).

Gohlke then met with individuals in NutraSweet's business groups as to what support they would need in the future (see, e.g., D.Ex. 13: Gohlke Dep. 121). Gohlke told Goldberg that reductions would be made in the legal department and that he should proceed to build the department from zero (D.Ex. 14: Goldberg Dep. 146).[17] She said it was likely that other than the two of them the post-reconfiguration legal department would comprise only one or two litigators, one patent attorney and perhaps only two commercial attorneys (D.Ex 12: Gohlke Dep. 120–21; D.Ex. 14: Goldberg Dep. 146; D. 12(m) ¶ 64). Gohlke also met with the heads of the three practice groups: Silhavy (Litigation), Sanders (Patent) and Grayson (Commercial) (D.Ex. 12: Gohlke Dep. 127, 141).[18] According to Gohlke and Goldberg, each group was analyzed individually:

1. In Litigation Richo rather than Burkhardt was terminated.[19] Goldberg testified that because the workload would remain constant despite the cutback, the attorney with more experience, who would need less supervision and could do increased and more diverse work, was retained.

2. In Patent Solomon was terminated. Goldberg testified that decision was influenced by Sanders, who thought Hoster's greater experience was determinative (D.Ex. 14: Goldberg Dep. 150).

3. Decisions in Commercial were made on a different basis. Gohlke, who had commercial experience herself, determined that the department would need two lawyers with "major jobs," one to represent the NutraSweet business groups and one to represent the Simplesse business group (D. 12(m) ¶ 68). It was also decided that only one lawyer would be needed to assist them (*id.*). Gohlke wanted Anderson and Grayson to take the two lead spots (D.Ex. 13: Gohlke Dep. 127–30). Anderson, who did not want to return to work full-time, declined. Grayson and an outside candidate, David Bowman ("Bowman"), took those positions, and Cody was retained to support them (*id.* 269–70; D. 12(m) ¶ 70). Karbowiak and Zammuto were terminated (D. 12(m) ¶ 68).

### Section 1981 and Title VII Claims

■ Richo claims that she was the victim of discriminatory treatment (1) in her bonus compensation because of her race and (2) in being terminated on account of her race and sex.[20] On such disparate treatment claims the burdens of proof and production remain the same under both Section 1981 and Title VII (*Von Zuckerstein v. Argonne Nat'l Lab.,* 984 F.2d 1467, 1472 (7th Cir.1993); *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 364 (7th Cir.1983)). *St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993) (citations omitted) recently addressed those burdens:

> The plaintiff in such a case … must first establish, by a preponderance of the evidence, a "prima facie" case of racial discrimination.

> \*      \*      \*      \*      \*      \*

---

17. Burkhardt testified that Gohlke told attorneys in the legal department that the reorganization had "nothing to do with the company's performance," but that it was motivated by NutraSweet's new direction (P.Ex. B: Burkhardt Dep. 218).

18. Gohlke also testified that she had discussed terminations in the Commercial department separately with Anderson (*id.* 127, 139), although her only specific recollection of talking to Anderson was in terms of whether Anderson herself wanted to return full-time, as Gohlke strongly desired (*id.* 139–40). Anderson said that she had not been consulted about who should be terminated or retained before Goldberg told her the names of those selected for termination (P.Ex. A: Anderson Dep. 78).

19. Richo was notified of her termination on March 25, 1991 (D. 12(m) ¶ 71).

20. As *Young In Hong,* 993 F.2d at 1260 n. 1 (citation omitted) recently quoted from *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), disparate treatment is "the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin."

Under the *McDonnell Douglas* scheme, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case—*i.e.,* the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action. It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff[.]" [21]

In other words, "[s]howing that the employer dissembled is not necessarily the same as showing 'pretext *for discrimination*'" (*Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.1987)). Rather the plaintiff must show *"both* that the [employer's proffered] reason was false, *and* that discrimination was the real reason" (*St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2752).

■ It must be remembered that cases such as *St. Mary's Honor Center* are phrased in terms of burdens of proof at trial. On this summary judgment motion Richo has a lesser burden: She need only show the existence of any triable factual issue that, if ultimately resolved in her favor, would meet her burden of persuasion at trial. Accordingly all references in this opinion—including quotations from other opinions—to what Richo must "prove" or must "show" should be understood in that lesser sense.

## 1. *Prima Facie Case and Legitimate, Nondiscriminatory Reasons*

■ Richo may establish a prima facie case either through direct evidence or by inference. Because she has adduced no direct evidence of sexual or racial animus on the part of NutraSweet or its managers, she must (and she seeks to) rely on indirect evidence. In that respect our Court of Appeals, drawing on *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973), has cautioned that "the elements of a *prima facie* case will vary depending upon the particular facts of various allegations of discrimination" (*Friedel v. City of Madison,* 832 F.2d 965, 972 (7th Cir.1987)).[22]

As the lower court's later-affirmed opinion had aptly pointed out in *Samuelson,* 760 F.Supp. 729, 736 (N.D.Ind.1991), the plaintiff's prima facie showing in these cases frequently cannot be analyzed "wholly discretely from the plaintiff's showing of pretext," so that it is preferable to "collapse the inquiry and focus on the showing of pretext," a position that our Court of Appeals also has taken on occasion (see, e.g., its decision affirming this Court in *McCoy,* 957 F.2d at 372). That decision to bypass the first two steps of the inquiry stems in part from (1) the intertwined nature of the prima facie case and the inquiry into pretext and (2) the facility with which an employer can meet its burden of

---

**21.** [Footnote by this Court] *St. Mary's Honor Center* held that the rejection by the trier of fact of an employer's proffered legitimate, nondiscriminatory reason does not entitle the employee to judgment as a matter of law.

**22.** In the case of a reduction in workforce, the prima facie case has been described as met if the employee can show the existence of four elements (*Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1113 (7th Cir.1992)):

(1) she was a member of a protected class; (2) she was satisfactorily performing the duties of her position; (3) she was discharged; and ... (4) others not in the protected class were treated more favorably.

It is less easy to define what constitutes a prima facie case of discriminatory compensation, which may depend on the nature of the claim (see, e.g., *Beard v. Whitley County REMC,* 840 F.2d 405, 411 (7th Cir.1988)).

coming forward with a legitimate, nondiscriminatory reason for its adverse action.

Here, for instance, no rightful question exists whether NutraSweet has set forth a legitimate, nondiscriminatory reason for terminating Richo. Imminent expiration of NutraSweet's critical patent and the changing direction of its business evidence "a sufficient economic change to necessitate a reduction" in its legal department (*Samuelson,* 976 F.2d at 1114). Indeed Richo herself really recognizes that (P.Mem. 20). For that reason this opinion—like the parties—focuses on whether Richo has met her burden of showing that (or more accurately raising a factual dispute as to whether) the reasons that NutraSweet gives are merely a pretext for discrimination.

### 2. *Pretext for Discrimination*

■ Once an employer carries its burden of presenting a legitimate, nondiscriminatory reason, the employee has the opportunity to raise a reasonable inference that those reasons were in fact a pretext for discrimination. On that score *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749 teaches:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination....

But it remains true that raising some factual doubt as to a legitimate, nondiscriminatory reason does not per se guarantee the employee a trial. As *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1570 (7th Cir.1989) (citations omitted) has explained:

> [I]t does not follow from all this, as [plaintiff] appears to believe, that if the plaintiff *does* rebut the employer's rebuttal—not in the sense of demolishing it but in the sense

of contesting it with his own, contrary evidence—he automatically defeats summary judgment and secures his right to a trial. The district court must still make a judgment as to whether the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff. If not, the court must grant the employer's motion for summary judgment.

To raise an inference that NutraSweet's reasons for not making her MIP-eligible and for terminating her were a pretext for discrimination, Richo essentially asserts that NutraSweet's proffered reasons had no basis in fact, did not actually motivate her exclusion from MIP eligibility or her termination and were insufficient to justify her exclusion from MIP eligibility or her termination (see *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988)). To that end she has combed the extensive discovery record (including the thousands of pages of deposition transcripts) and has pointed out a number of real as well as fancied inconsistencies in the evidence.[23] In addition she refers to other evidence that assertedly raises an inference of sex discrimination. This opinion will deal first with her compensation claim, then with her termination claim.

### A. *Compensation Other Than Salary*

■ NutraSweet maintains that Richo was excluded from MIP eligibility because of legitimate, nondiscriminatory reasons. During Richo's tenure there was no documented policy covering such eligibility, so it is necessary to rely on the deposition testimony given during the parties' extensive discovery.

Gohlke testified that in the legal department MIP inclusion was "determined generally" by her together with Goldberg and the employee's supervisor, and it was then passed on to personnel for approval (D.Ex. 13: Gohlke Dep. 171–72). She said that the criteria for making the MIP eligibility determination were whether "they had a bonus in

---

**23.** Unfortunately such efforts are not unique in the often emotion-charged environment of asserted employment discrimination—see, e.g., *Hights v. International Harvester Co.,* 675 F.Supp. 418, 421–22 (N.D.Ill.1987), *aff'd mem.,* 873 F.2d 1443 (7th Cir.1989), where the claimed victim of such discrimination was a legal secretary who showed herself well able to represent herself (though not to have kept her job). Because attorneys are not expected to share their clients' nonobjective mindsets, however, we tend to expect better of them.

their prior job, what their compensation, their salary versus other lawyers in the department, what their grade level was, what position they had" (*id.* 173–75), and also their "years of experience . . . and the number of years of experience of other lawyers" (*id.* at 180)—that "[g]enerally those were considerations" (*id.*).

Gohlke stated that Richo was not included in MIP because after analysis of her salary relative to her years of experience and those of other lawyers it was decided that including her in MIP would have led to her being "paid more than people with more experience in the department" (*id.* at 174–75). Moreover, P.Mem. 14 says:

> When specifically asked at her deposition to address the fact that Goldberg had recommended that [Richo] be made bonus eligible, Gohlke raised yet another barrier—too many participants in the bonus plan in the Legal Department—stating that if it was not necessary to induce a candidate, bonus eligibility should not be offered.[24]

Gohlke testified that a person not enrolled in MIP at the beginning of his or her employment could become enrolled by recommendation of his or supervisor or department head (P.Ex. F: Gohlke Dep. 181–82).

In opposition to Richo's pretext claim, NutraSweet first points out that Berenstein (as already stated, a white male) was not made MIP-eligible when he joined the company. In fact, NutraSweet urges that because Berenstein and Richo were the most inexperienced lawyers hired by NutraSweet, they were also the most directly comparable lawyers for purposes of the present motion. And because each of them was not afforded MIP participation, NutraSweet contends that alone negates Richo's race discrimination claim. Even though that argument may have substantial force,[25] this opinion goes on to dispel the other contentions advanced by Richo.

In that regard NutraSweet also explains why Cody and Solomon, who might also arguably be viewed as Richo's comparatives, were made MIP-eligible. With Cody, who had already been bonus-eligible at her two previous positions, her expectation of and desire for a bonus had been made clear to her legal recruiters—and she had expressly discussed NutraSweet's bonus program in her interview with Anderson (D.Ex. 10: Cody Dep. 61, 266–67). As for Solomon, both Gohlke and Goldberg had believed that he would not be offered MIP eligibility (see, e.g., D.Ex. 14: Goldberg Dep. 55–56). But a year after his employment began, they learned that his supervisor in Patent (Sanders) had offered him MIP eligibility at the outset, so he was made MIP-eligible (*id.*). NutraSweet also argues that the inclusion of those two lawyers, while Richo was excluded, was wholly appropriate considering the differences in their experience relative to their total compensation (D.Mem. 8):

> [A]lthough Solomon had been out of law school for one year longer than [Richo] and Cody had been out for two years longer, all three were earning $70,000. Thus any differential in the three attorneys' bonuses is accounted for by the differentials in their experience. Although they received MIP awards instead of special awards, the fact that Cody, Solomon and [Richo] were all earning the same salary, but were paid graduated bonuses for 1990—$10,000, $7,000 and $5,000, respectively—further substantiates NutraSweet's articulated reason for the differentials in their bonus payments.[26]

---

**24.** [Footnote by this Court] This Court's effort to follow the tortuous path of Richo's counsel's record citations to support that statement has led only to P.Ex. F: Gohlke Dep. 314, which supports part but not all of the statement.

**25.** Richo consistently emphasizes Berenstein's performance problems and termination in an effort to show that he is not comparable. Though that no doubt would be relevant if the decision not to make Berenstein MIP-eligible had been made based on his performance *after* he was employed, it leaves intact NutraSweet's arguments about its *initial* decision not to make him bonus-eligible and how that bears on Richo's contentions.

**26.** [Footnote by this Court] Because a *substantial* part of the parties' submissions focuses on the inclusion (and exclusion) of attorneys in the special award and MIP plans, an appendix to this opinion sets out the salary and any additional compensation received by each employee under each program. That appendix contains confi-

Richo urges that the testimony of Nutra-Sweet's witnesses is self-contradictory on the process for making an attorney MIP-eligible and on the criteria used to make that determination. She also maintains that Nutra-Sweet's MIP-eligibility criteria did not justify her exclusion from that plan.

In the former respect, Richo first points to Gohlke's statements about the process used in determining whether to make a new hire MIP eligible: that determinations were generally made by her, Goldberg and the appropriate supervisor[27] and then sent on to personnel. Richo maintains (1) that Anderson testified that she was not involved in discussions with management regarding bonus eligibility, (2) that Sanders offered Solomon bonus eligibility without consulting Gohlke or Goldberg and (3) that the corporate staff's Human Resources Director John Russert ("Russert") testified (a) that there was no required Human Resources approval required for bonus eligibility and (b) that he was not involved in determining bonus plan eligibility for Richo, Cody or Solomon.

Richo is correct in characterizing the procedure used to determine MIP eligibility as less than clear: It is certainly fair to say that the decisional process was not formally structured. But at the outset it is important to observe (as Richo does not, see n. 27) that Gohlke testified not that she *always* consulted with Goldberg and a supervisor, but rather that was how determinations were "generally" made (D.Ex. 13: Gohlke Dep. 171). Moreover, some of the claimed inconsistencies on which Richo relies are not as signifi-

cant as she makes them out to be, while others are really nonexistent—are unsupported by a close look at the record.

Richo points, for example, to testimony by Anderson and Sanders as being sufficiently at odds with Gohlke's testimony so as to create an inference of a discrimination-motivated pretext on Gohlke's part. But any objective view of the matter fails to support Richo's contention.

As for Anderson's testimony, Richo's characterization does not begin to tell the entire story. While Anderson testified that she was not involved in the actual determination of employee bonuses (P.Ex. A: Anderson Dep. 95) and did not "specifically discuss" MIP eligibility with management (*id.* 96), she also said that with respect to the people she hired (i.e., Cody and Grayson, *id.* 74, 97) "there was an understanding that if they were receiving a bonus previously, they would be getting a bonus with NutraSweet" (*id.* 96–97). As for Sanders having offered MIP participation to Solomon without having consulted Gohlke or Goldberg, it does indicate that Gohlke and Goldberg must have made their determination *not* to include Solomon (which was later reversed on learning what Sanders had promised him) without telling Sanders. But it really adds nothing to Richo's case: It suggests no more than that a supervisor may have acted out of line (though his superiors later commendably backed him up by honoring the commitment that he had made) and that Gohlke had not included the supervisor in that specific determination.[28]

---

dential business information of NutraSweet, so it is not being published with this opinion.

27. It is unfortunately symptomatic of Richo's presentation that she glosses over (or rather ignores entirely) the qualifying term "generally" that Gohlke used twice in describing the decisional process.

28. Richo also maintains that Gohlke's description of the MIP eligibility process is undercut by Russert's testimony (P.Ex. L: Russert Dep. 201–04). She asserts that Russert "testified that there was no required Human Resources approval for bonus eligibility prior to 1991" (P.Mem. 12). To begin with, the patchwork deposition portions provided by Richo make it extremely difficult to determine exactly what Russert said. Moreover, it does not appear that Richo's characterization

of Russert's testimony is wholly accurate. Russert testified that at some point in 1991 an unwritten policy change went into effect that imposed a requirement that offers of employment and MIP eligibility could not be made without "corporate compensation" approval. Richo has not identified any evidence that "corporate compensation" and "human resources" are the same thing, and Russert's testimony certainly seems to indicate that they are not (P.Ex. L: Russert Dep. 19–20, 93–94, 99–100). Russert also testified that before the 1991 change he did not know the substance of NutraSweet's MIP eligibility policy (*id.* at 94). As to his lack of involvement in determining Richo's, Cody's and Solomon's eligibility, Russert testified that "[t]he list was already determined by someone other than myself" (*id.* 94–95), suggesting that some sort of list *had* been forwarded to Human Resources for approval.

In summary, there is indeed an issue of fact as to the formal process (or more accurately the lack of one) used to determine MIP eligibility. But that is really a red herring, for Richo's burden is not to raise some issue of fact but rather an issue of fact that is outcome-determinative—that is, that reasonably implies discriminatory intent. To that end the relevant inquiry is into (1) what Richo claims are issues of fact concerning the criteria used in making MIP eligibility determinations and (2) whether those criteria were applied to Richo.

On the first of those topics, Richo refers to the testimony of various NutraSweet employees and emphasizes that different employees testified to different criteria. From that she argues that the asserted criteria were pretextual. That of course does not necessarily follow, for no one testified that the criteria were inflexibly applied in each case as though part of a checklist. Moreover, in a general sense the inclusion of certain criteria does not necessarily connote the exclusion of all others or denote a guaranty that they will be applied in all cases. In any event, an examination of Richo's alleged inconsistencies shows not only the fault in her wooden approach but that many of the alleged contradictions in the evidence are merely illusory. There is no need to plod through each of Richo's many claimed inconsistencies—a few examples will suffice.[29]

As the first example of what Richo claims are "rampant" contradictions in the testimony concerning bonus eligibility, she says that Anderson "testified that she believed newly hired attorneys were eligible for the MIP bonus only if they had received a bonus in their prior job" (P.Mem. 13). That is simply false—Anderson actually testified (P.Ex. A: Anderson Dep. 96–97) to her understanding that if a candidate was receiving a bonus in his or her previous job, then he or she would receive a bonus at NutraSweet. Thus the difference between Anderson's actual testimony and Richo's mischaracterization of that testimony presents the classic distinction between a sufficient condition (which a prior bonus was) and a necessary condition (which it was not). Relatedly Anderson also said that—although she was not involved in the decision—Berenstein had not been MIP eligible because he was "very junior" and at "too junior a level" (*id.* 97). Again that testimony cannot fairly be construed as meaning that prior bonus receipt was the sole consideration in determining MIP eligibility. It is just not reasonable to read the testimony as being inconsistent with what Gohlke said in that respect.

Next P.Mem. 13 (record citations omitted) asserts that Goldberg and Gohlke offered contradictory testimony about bonus eligibility criteria:

> Although the attorney's prior salary is not now asserted by Defendant as a bonus eligibility criterion, Goldberg testified that it was a criterion with respect to Burkhardt. Gohlke never mentioned this as a criterion, nor could such a criterion have been applied. If it was a criterion, [Richo] most definitely should have received a bonus, as she had earned $65,000 plus a Christmas bonus at her prior job, and Cody had earned $62,000 and no bonus at hers.

Again that impermissibly stretches the record. Instead Goldberg testified that he and

---

P.Mem. 12 also states that "Clark, Human Resources Vice President, testified that Gohlke and Russert should have determined [Richo's] eligibility in the MIP bonus plan." But that statement came from Richo's counsel (who cannot, of course, be an evidentiary source), *not* from Clark (see P.Ex. C: Clark Dep. 193):

Q: Do you know why Anna Richo in 1989 was not a participant in the management incentive compensation plan?

A. No, I'm not familiar with it.

Q. Do you know who—it would have been John Russert who was the human resources person at the time who assisted in making that determination—

A. With—

Q. —with Linda Gohlke.

Even with the evidence construed in her favor, Richo has shown at most some failure of understanding on Human Resources' part, not that Gohlke did not believe that Human Resources' participation (in whatever form) constituted part of the MIP eligibility process.

29. This Court has reviewed everything that Richo offers and has found it totally wanting. There is just no need to recount and to refute each detail—an unjustifiable added burden under the circumstances.

Gohlke discussed the need to offer MIP participation to Burkhardt to induce her to join NutraSweet (D.Ex. G: Goldberg Dep. 36). Though he did not remember the specifics of the conversation, he recalled that MIP represented one way by which NutraSweet could compensate in part for its inability to compete with large law firms (id. at 36–37). That is not inconsistent with Gohlke's testimony, especially considering her statement (to which Richo points—see, e.g., P.Mem. 14) that whether an employee was offered MIP eligibility was determined in part by whether it was necessary to get him or her to join the firm.

Richo's statement that she received a bonus at her prior job while Cody had not is also misleading. As for her own "bonus," Richo testified (D.Ex. A: Richo Dep. 95–96):

> Q. Did you ever receive a bonus at Peterson, Ross?
>
> A. They didn't have bonuses, they had—well, yes, a Christmas bonus. Yes.
>
> Q. What was the largest bonus you received?
>
> A. It was just a few hundred bucks. They did it by class.
>
> Q. So, it wasn't a significant part of anyone's compensation, is that correct?
>
> A. No. It wasn't even considered a bonus.
>
> Q. More like a Christmas gift from the firm?
>
> A. Right. They didn't couch it in bonus terms.

And as for Cody, she was initially bonus-eligible at Chicago Pacific Corporation, which froze bonuses when it became an acquisition candidate approximately four months after Cody joined it (P.Ex. E: Cody Dep. 48). Before that she did receive a bonus at Shef-

sky, Saitlin & Froelich (D.Ex. 10: Cody Dep. 64). Moreover, she wanted a bonus at NutraSweet and specifically discussed that expectation with her legal recruiters (id. 266–67).

■ Before this opinion addresses the other branch of Richo's claim—that she was eligible under the stated MIP eligibility criteria—it is well to repeat our Court of Appeals' frequent admonition that a federal court "does not sit as a super-personnel department that reexamines an entity's business decisions" (Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir.1986)) and that "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers" the court should look only into "whether the employer gave an honest explanation of its behavior" (Pollard, 824 F.2d at 560).[30] Most important, no court should lose sight of the fact that the purpose of the entire inquiry is to see whether the evidence creates a reasonable inference of discrimination. On then to Richo's belief that the asserted criteria did not justify her exclusion from MIP eligibility.

In that respect it is surprising that Richo brings to the forefront the issues of prior bonus eligibility and bonus demand. This opinion has already discussed the bogus contrast between Richo and Cody in that respect, including the latter's express negotiation of the bonus issue when she was being interviewed.[31] Richo is wholly unpersuasive in making an issue out of Cody's failure to give an actual ultimatum—hardly an unusual or foolhardy interview strategy, and something that was uncalled-for anyway. By contrast, the subject of bonus eligibility never even arose in Richo's interview process. Richo's attempt to undercut the bona fides of

---

**30.** These quotations from Pollard must not be misunderstood—nothing in this case suggests any such characterization of NutraSweet's decisions would be in order. It is rather that this Court's refusal to accept Richo's invitation to second-guess those decisions flows a fortiori from the quoted principles announced in Pollard.

**31.** Cody testified (D.Ex. 10: Cody Dep. 266–67):
> Q: Did you ever tell [your legal recruiters] you would not take the job at NutraSweet if you did not get a bonus?

> A: I don't remember. I don't remember if I stated it that emphatically, but I said I would expect to be bonus eligible.
>
> *   *   *   *   *   *
>
> Q: Well, you don't characterize your request for the bonus as a demand, do you?
> A. You know, I asked for it and I got it. So I don't know if I would have demanded it if I had to. It's just hard to say.

NutraSweet's failure to confer such eligibility in her case by labeling Cody as a comparative who was given different treatment fails utterly.

Next Richo argues that her own limited experience did not justify her exclusion from MIP eligibility. She says accurately enough that no specific number of years' experience was required—that is, that no set policy existed. But that creates no inference that NutraSweet's stated reasons for excluding her from MIP eligibility were a sham. What she does not and cannot argue in that respect is that her experience warranted inclusion in the MIP program. Berenstein was not made MIP-eligible at the time of his hire, and neither Gohlke nor Goldberg would have made Solomon (who was out of law school one year longer than Richo) MIP-eligible had Sanders not offered that to him without their approval. In fact, Richo has not directed this Court to any attorney with less experience than Richo who *was* made MIP-eligible. Once more Richo's claim does not hold water.[32]

Finally, Richo attacks NutraSweet's contention that there were too many participants in the bonus plan. P.Mem. 19 asserts:

> There is no evidence offered by [NutraSweet] that any of the new hires after plaintiff—Cody or Solomon ([NutraSweet's] comparatives), Grayson or Bowman—had to receive bonus eligibility as an inducement to accept employment with NutraSweet.

Once more Richo's position distorts the record. Again Gohlke did not testify that no attorneys were made MIP-eligible unless they demanded inclusion, instead stating only that necessary inducement was a consideration because she could not get approval for every attorney to be in the program (P.Ex. F: Gohlke Dep. 314). Russert also testified that he had heard that too many attorneys in the legal department were MIP-eligible (P.Ex. L: Russert Dep. 112). It has already been mentioned twice that Cody—in contrast

to Richo—had focused on bonus eligibility before coming to NutraSweet and had placed that issue on the table before accepting an offer. And Solomon too has been discussed twice, each time demonstrating the poverty of Richo's contentions. As for Grayson and Bowman, they were hired with much greater experience. To have excluded them from MIP eligibility would have placed their compensation out of kilter with comparable attorneys, which would have been inconsistent with the other criteria for MIP eligibility.

After a detailed examination of each of Richo's contentions and of what she alleges to be inconsistencies in the record, this Court is left with the distinct sense of having been put upon. Instead of Richo having demonstrated a material issue of genuine fact that NutraSweet's proffered reasons for not making Richo MIP-eligible were a pretext for racial discrimination, it is Richo's own arguments that have proved pretextual. "It would demand a truly extraordinary leap to infer" from Richo's asserted (and often unsupported) inconsistencies in the record that NutraSweet's explanations for not including Richo in MIP were a cover for racial bias (*Hights,* 675 F.Supp. at 423).

Indeed, even though this added factor is of course not determinative, it must be recognized as relevant that Richo was hired when NutraSweet's legal department was specifically looking to hire a qualified black lawyer and had taken affirmative steps toward that end. Is it logical to infer that such a race-conscious affirmative decision would be coupled with a simultaneous race-conscious negative decision? Only the most jaundiced eye would find an inference of discrimination on the facts here. As this Court stated in *Hights, id.,* at 424:

> Only someone who finds evidence of bias in every adverse (or even arguably adverse, though more likely neutral) action that has affected someone who *happens* to be black—or Jewish, or female, or from Paki-

---

32. In an effort to show that no correlation existed between MIP eligibility and experience, P.Mem. 19 n. 17 says that in 1989 Solomon's salary was $70,000 and that he received no bonus and therefore "was getting no credit for the fact that he had 1½ years more experience than

plaintiff." NutraSweet's response is simple: Solomon was not hired until November 27, 1989, so that nothing can legitimately be made of the failure to award him a year-end bonus after only a month's employment (D.R.Mem. 16).

stan, or older [12]—could perceive even a glimmer of such motivation in the record here. That may be [plaintiff's] subjective view, but a court is duty-bound to take a less biased view.

[12] This catalog is simply exemplary of the categories of employment discrimination barred by Title VII (in that order) and by the similarly antidiscriminatory ADEA.

Counts I and II fall as a matter of law.

### B. Termination

■ NutraSweet's legitimate, nondiscriminatory reason for terminating Richo, already set forth under *Facts,* need not be repeated. In that respect Richo contends that the stated reason was a pretext for race and sex discrimination. Her theory is that Gohlke "first eliminat[ed] the white male directors from consideration for termination ... and then cleverly craft[ed] the criteria below those levels in order to accomplish the elimination of the sole Black female in the Litigation Section and the alleged 'worst performers' in the Commercial Section, who were female, with Karbowiak having had one child and being pregnant at the time" (P.Mem. 22). Richo argues both that NutraSweet was unfaithful to its selection process and that Gohlke's treatment of other female attorneys raises an inference of discriminatory motive. As before, those contentions prove empty as a counter to NutraSweet's Rule 56 motion.

Richo's challenge to NutraSweet's stated selection process for termination is tripartite. First she says that Gohlke was not faithful to her stated criterion of rebuilding the legal department from zero. Next Richo stresses her own excellent performance. Finally she argues that "Gohlke deviated from the set policy that Human Resources created for purposes of objectively reviewing the RIF selection decisions" (P.Mem. 23).

Richo emphasizes that "Directors in the Legal Department ... were not considered candidates for termination despite the alleged 'ground zero' game plan" (P. 12(n)(2) ¶ 60 [33] ). Goldberg testified that Gohlke had told the area heads that they would not be considered for termination (D.Ex. 14: Goldberg Dep. 148) and that in discussions concerning who would be retained "[t]he director level was out" (*id.* 149). Gohlke denied having made the determination that Directors would be retained until after receiving recommendations from others as to the terminations. As a result, an issue of fact does exist as to whether NutraSweet truly implemented a "ground zero" game plan—though not carrying that label (see n. 33).[34]

■ As for the quality of Richo's own job performance, evidence of such good performance is of course germane when an employer offers inadequate performance as its legitimate, nondiscriminatory reason. But it does not play the same role in a RIF situation where the employer makes no argument that the employee was a poor performer. In such situations the relevant inquiry is whether "a comparison of her performance to those retained in employment" creates a reasonable inference that experience was not the true reason for her discharge (see *Samuelson,* 760 F.Supp. at 738).

Apparently recognizing that burden, Richo not only urges that she was an excellent attorney but also goes so far as to assert that "there are issues of fact with respect to whether Silhavy was a better performer than

**33.** Though perhaps a minor point (or perhaps not in view of counsel's obligations to this Court), both that paragraph and the preceding one expressly ascribe the asserted " 'ground zero' game plan" language to Gohlke's testimony. But the only record citation that Richo provides is to Goldberg 's deposition (P.Ex. F), in which he referred to "a process of building up an organization from zero and then filling in boxes with people who you felt had the skills that you needed in that particular position" (*id.* Dep. 146–47). It is really intellectually dishonest for Richo to charge a witness with terminology that she did not use, then to criticize her for assertedly not having acted in accordance with that terminology.

**34.** This time it is NutraSweet's turn to try to recast the record. Its D. 12(n)(2) ¶ 60 says:

Goldberg did not testify as to when this alleged statement by Gohlke [that the directors would not be considered for termination] may have occurred, thus it could well have occurred *after* Gohlke considered the directors' skills.

That does not suffice to eliminate a factual issue, given Goldberg's already-quoted statement that when considering terminations in Litigation "[t]he director level was out."

Plaintiff or whether he was simply the pre-ferred 'golden boy' who had been groomed by Goldberg and Gohlke with complete disregard of his actual performance and that of his female colleagues" (P.Mem. 23). Even aside from the total lack of record support for that pejorative characterization and the suggested inference, that really pushes things much too far. Even if it were to be assumed that Richo performed well beyond her years (something that the record does not bear out), she has not justified any inference that her performance was so good that NutraSweet's reliance on experience was pretext: To compare her to the Litigation Director, who had far greater experience, is really to liken apples to oranges.

Richo finally disputes the selection process for termination by asserting that Gohlke deviated from the Human Resources policies created to facilitate objective review of RIF decisions. Richo refers to Russert's testimony (P.Ex. L: Russert Dep. 119, 201–04). Russert said that his responsibility was "to work with each of the seniors or each of the corporate functions in the analysis of their organizations" (*id.* at 201). Toward that end, he was to "work with the corporate staff and identify people that were working in ... unnecessary services and finalize how they might be or not be utilized by the company" (*id.* at 203).

Gohlke and Russert had two meetings. In the first meeting, which was "fairly brief," Gohlke told Russert that "her decision had been made as to who was staying and who was leaving." According to Richo, that shows Gohlke violated company policy by presenting Russert with a "fait accompli" (P.Mem. 23–24). But what Richo conveniently ignores is that Gohlke and Russert had a second meeting a few weeks later to review the rationale for the determination decisions. Russert in fact stated that he found "no fault in [Gohlke's] logic" concerning the terminations in the Litigation and Patent areas and, after listening to her, agreed with her decision in Commercial as well (D.Ex. M: Russert Dep. 210–11).

As her last gasp, Richo contends that Gohlke's treatment of other female attorneys raises an inference of discriminatory motive.

As befits a last-gasp position, it is singularly enfeebled. What arguments she does advance frankly do not deserve the detailed repetition that would further enlarge this already overlong opinion—suffice it to say that each of them is belied by the record. Only two examples will be given by way of illustration.

First, Richo focuses on Gohlke's treatment of Karbowiak, stating on two occasions (P.Mem. 4 n. 6, 24) that "Gohlke made discriminatory *remarks* to Karbowiak when she asked to extend her maternity leave by about 10 days through the Christmas holidays" (emphasis added). But the only *evidence* to which Richo directs this Court shows no such "remarks" at all (P.Ex. N: Karbowiak Dep. 558–59):

> Q. During your conversation with Linda Gohlke where you had asked for these ten unpaid leave days, did Linda Gohlke ever refer to your sex?
>
> A. No, she didn't.
>
> Q. Did she ever refer to the fact that you were a working mother with children in this conversation?
>
> A. Not directly.
>
> Q. Did she do so indirectly?
>
> A. It was my take away from the conversation because at one point she questioned my loyalty to the organization and my professionalism for requesting this.

Though this and Richo's other claims as to Karbowiak (which are the subject of another lawsuit by the latter and do not call for discussion here) might conceivably be stretched to suggest some personal animus, there is nothing that even whispers of sex discrimination.

Richo's claim that Anderson's being demoted from Director to Senior Attorney evidences discrimination is if anything even more infirm. In fact Gohlke asked Anderson to return to work full-time because she wanted her help in meeting Flynn's objectives. There is simply nothing in the record to suggest that requiring full-time work of a Director in times of company upheaval leads to a reasonable inference of sex discrimination.

Again in sum, no rational trier of fact could infer that Richo's termination violated the statutes on which she bases her claims. NutraSweet has stated totally credible reasons for terminating Richo, and in response she has failed to offer any material facts to support an inference of pretext for discrimination. Quite to the contrary, it is again her own theories that smack of pretext. For example, Richo makes much of the fact that Gohlke (incidentally also a woman) terminated Karbowiak—as Richo would have it, to get rid of someone who was pregnant. Yet she would obviously prefer this Court to forget that Gohlke interviewed and participated in the hiring of Richo herself while she was pregnant, as well as asking Anderson to stay on as a full-time Director, knowing full well that she was a woman with children. As with Richo's compensation claim, only a biased eye could perceive a discriminatory motive as lurking behind Richo's termination or conclude that any similarly situated person was treated differently. Counts III and IV perish as well.

### Promissory Estoppel

Richo asserts in Count V and in her memoranda that she relied to her detriment on Goldberg's statement that she was bonus-eligible both in purchasing a new Mercedes and in continuing her employment. That state-law claim is supplemental to her now-dismissed federal claims.

Such claims are frequently dismissed without prejudice when all federal claims are dispatched before trial (*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)), but that does not hold true in all cases. Where the outcome is clear and judicial economy would be disserved by dismissal—that is, where "the process [would have] to begin anew in state court" (*Hights*, 675 F.Supp. at 424)—the federal court may act on the claim. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993) (citations omitted) has recently reconfirmed that

concept in the wake of the supplemental jurisdiction statute, 28 U.S.C. § 1367:

> [I]f the correct disposition of a pendent claim or action was so clear as a matter of state law that it could be determined without further trial proceedings and without entanglement with any difficult issues of state law, considerations of judicial economy warranted retention and decision rather than relinquishment of the case to the state court.
>
> \* \* \* \* \* \*
>
> We can see no reason why it should not be a principle of the new supplemental jurisdiction as well, bearing in mind the statutory purpose and the legislative history and also the fact that the statute says that the court "may" relinquish its supplemental jurisdiction if various conditions such as the dismissal of all the claims within the court's original jurisdiction are satisfied, not that it must always do so.

In this instance an examination of the principles of Illinois law, as they bear on Richo's state law claim, counsels that claim's dismissal as well. To establish a cause of action for promissory estoppel under Illinois law, "the plaintiff must prove (1) an unambiguous promise by the defendant to the plaintiff, (2) the plaintiff's reliance on such promise, (3) that the plaintiff's reliance was expected and foreseeable by the defendant, (4) that the plaintiff's reliance was detrimental, and (5) that the plaintiff's reliance was reasonable and justified" (*Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 235 Ill. App.3d 224, 234, 176 Ill.Dec. 258, 265, 601 N.E.2d 956, 963 (1st Dist.1992)). Richo's claims as to the purchase of the car and as to continuing her employment will be looked at separately.

It is really an understatement to label as ill-founded Richo's argument that she bought a Mercedes in reliance on Goldberg's promise of bonus eligibility. By Richo's own admission, Goldberg assured her only that she was bonus-*eligible* and not that she would receive a bonus, much less the minimum of $10,000 that she claimed to have expected after speaking to Cody.[35] On being told that she

35. In fact, Cody's offer letter specifically stated that "[i]ncentive eligibility is a range from 0 to

was bonus-eligible, Richo could reasonably have expected no more than that she would be an employee for whom a bonus was potentially available—that is, that she was qualified but not guaranteed to be chosen. And even were she given the benefit of the doubt in that respect, a focus on the final element of the cause of action (the reasonable and justified nature of the promisee's reliance) shows that there was unquestionably no assurance that she would receive more than the $5,000 that she was actually given as a special award. That negates any reasonable reliance on a larger payment.

█ As for Richo's claim that she would have begun looking for work had Goldberg not promised her bonus eligibility, that founders on the first essential element of a promissory estoppel claim: an unambiguous promise. It will be recalled that Richo had no discussion at all on the subject of bonuses when she was first hired, and when she learned of her $2,500 special award just under a year later (in March 1990) she was unconcerned because she had only been employed for a half year in 1989 (taking account of her maternity leave).

When she later asked Goldberg whether she was "bonus eligible" and he responded affirmatively, neither the inquiry nor the response was linked to the existence of the two plans (MIP and special awards) or to the difference between them. There is no way in which Goldberg's statement—even if it were accurate to label it as a "promise" of actual payment rather than eligibility for participation, which is itself a stretch—can be characterized as an "unambiguous promise" of *MIP* participation and payment. And even if the statement were to be read as such an "unambiguous promise" (as it was not), it could not be stretched even further into a promise to pay an amount greater than the amounts that Richo received as special awards.

Indeed, even Goldberg's second response in late 1990 (when Richo had focused on the existence of the two types of incentive awards and had sent a memo inquiring about the difference between them) cannot convert his earlier statement about bonus eligibility into the required unambiguous promise that she would receive (1) an MIP award (2) of $10,000 or more, rather than what she did receive—the $5,000 that Goldberg understood to be the ceiling for the special-award category. And the fact that Goldberg himself may not have been entirely clear on the two categories [36] actually cuts against the essential component of nonambiguity.

█ It is true that without what she labels as Goldberg's representation, Richo claims that she would have looked for other work and that perhaps she would not have stayed long enough to be terminated.[37] And to be sure that would be a nonfrivolous contention on the issue of detrimental reliance *if* the other elements of the cause of action were present (cf. *Vajda v. Arthur Andersen & Co.*, —— Ill.App.3d ——, ——, 191 Ill.Dec. 965, 971–72, 624 N.E.2d 1343, 1349–50 (1st Dist.1993) (relying on promises in continuing employment can constitute promissory estoppel detrimental reliance)).[38] But the presence of one component of a cause of action cannot make up for the absence of another essential ingredient, and that fatal flaw in Richo's state-law claim has already been exposed here.

100% of base dependent upon Company, Business Group and personal performance" (D.Ex. 25).

36. It will be remembered that Richo testified (D.Ex. A: Dep. 330–31) that Goldberg told her that they were "essentially the same" but had in the past come out of different pots of money.

37. NutraSweet objects that Richo's affidavit stating that she would have quit, Ex. A attached to her Rule 56 memorandum, contradicts her own deposition testimony (D.Ex. A: Dep. 647–48). Richo attempts to squirm out of that attack (which would permit this Court to reject her belated change of position—see, e.g., such cases as *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (1993)) with a strained reading of her deposition testimony. Although NutraSweet has the better of that exchange by far, this opinion proceeds to discuss the issue briefly on the dubious premise that Richo might be right. It does not help her anyway.

38. *Vajda* will not become final until the 21–day period for a petition for rehearing has expired.

It is also worth mentioning in passing that even the extent of Richo's claimed detriment is questionable. For one thing, the most that Richo could claim even under the most favorable reading would be that she did not explore other employment between the time of her second response from Goldberg late in 1990 and her date of termination in March 1991. And for another, any damages that Richo might claim in that respect are certainly negligible in light of her having begun other employment less than one month after leaving NutraSweet's payroll (D.Ex. A: Richo Dep. 668–70).[39]

In short, Richo's state claim falls into the category described in *Brazinski,* under which judicial economy counsels its disposition without imposing on some state court judge (to say nothing of imposing further on Nutra-Sweet). It too falls flat.

### Conclusion

There are no genuine issues of material fact as to any of Richo's claims, either federal or state, and NutraSweet is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

**39.** Richo testified that she received severance pay until September 10, 1991 (as well as receiving accrued vacation pay) and that she began her new job on October 7, 1991 (D.Ex. A: Richo Dep. 669).